IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

SOUTHEAST X-RAY, INC.; and
REAL RADIOLOGY, LLC                                              PLAINTIFFS

v.                              Case No. 2:13-CV-02026

MICHAEL SPEARS; KENNETH DEAN
VAUGHAN; and RAPID RADIOLOGY, INC.                              DEFENDANTS

## MEMORANDUM OPINION AND ORDER

Before the Court are Plaintiffs Southeast X-Ray, Inc. ("SXR") and Real Radiology, LLC's ("Real Radiology") Motion for Preliminary Injunction (Doc. 5) and Brief in Support (Doc. 6). The parties appeared before the Court on February 26, 2013 and on March 1, 2013 for a hearing on the Motion. In advance of the hearing, Plaintiffs submitted a Pre-hearing Memorandum (Doc. 21), and Defendants Michael Spears ("Spears"), Kenneth Dean Vaughan ("Vaughan"), and Rapid Radiology, Inc. ("Rapid Rad") also submitted a Pre-hearing Memorandum (Doc. 22). During the hearing, both Plaintiffs and Defendants called witnesses and introduced evidence. At the conclusion of the hearing, Plaintiffs renewed their Motion for Leave to Serve Written Discovery (Doc. 7) and to require Defendants to provide expedited responses to such discovery. The Court had previously denied Plaintiffs' Motion for Leave to Serve Written Discovery on February 15, 2013, but had specifically stated in the text of the order that Plaintiffs could renew their expedited discovery Motion at the time of the preliminary injunction hearing.

After considering the briefs submitted by the parties on Plaintiffs' Motion for Preliminary Injunction, as well as the evidence and testimony presented at the two-day hearing, the Court is now

-1-

ready to render its decision.  To the extent that this Order conflicts with any oral pronouncement made during the hearing, the findings in this Order are the final and binding findings of the Court in the current matter.

## I.  Background

Plaintiff SXR is an Arkansas corporation that performs digital radiology and medical testing for clients nationwide.  Until the close of 2012, part of SXR's business comprised teleradiology services.  Teleradiology involves the electronic transfer of x-rays and other medical images from hospitals and clinics to data servicing liaisons, such as SXR, which in turn contract with licensed radiologists who read and interpret the images.  According to SXR, its unique software interface and database allow it to manage workflow and provide technical and billing support and assistance to clients and radiologists.  SXR also expends time and effort in assisting radiologists in obtaining the proper state credentialing required by clients.

Plaintiff Real Radiology is a Colorado limited liability company that acquired the teleradiology portion of SXR's business through an asset purchase agreement on December 31, 2012. On January 9, 2013, Real Radiology secured copyright protection for SXR's integrated computer software program, called PACSRat, and provided SXR with a license to use the software.  Real Radiology now performs teleradiology services for SXR's former clients.

Defendant Spears is a former employee of SXR who, while still employed by SXR, started a new teleradiology business called Rapid Rad, which is also a Defendant in this case.  Rapid Rad is an Arkansas corporation that provides teleradiology services in direct competition with Real Radiology.  Spears worked for SXR from January of 2009 until he was fired on December 21, 2012.

During the four years that Spears worked for SXR, he primarily served as Director of Marketing for the company.

Defendant Vaughn was hired by SXR in January of 2005 and served as Director of Information Technology.  During Vaughn's time at SXR, he was instrumental in developing the PACSRat software that SXR used in conducting its teleradiology business.  Vaughn voluntarily quit his job at SXR as of February 1, 2013, in order to work for Spears's business, Rapid Rad.

During the course of Spears's and Vaughn's employment with SXR, both men signed a document called a "Confidentiality, Privacy and Security Agreement." (Doc. 1-2).  This Agreement states in relevant part that "[t]he browser interface, printed worksheets and other written, printed, graphic, or electronically recorded data furnished by SXR . . . are the proprietary property of SXR." *Id.*  The Agreement further states that employees of SXR "will maintain in confidence and will not, directly or indirectly, disclose or use, either during or after the term of this agreement, any proprietary or confidential information or know-how belonging to SXR . . . whether or not it is in written format or electronic format . . ." *Id.*

Spears and Vaughn also signed "Non-Disclosures" during the course of their employment with SXR.  (Doc. 1-5).  The Non-Disclosures defined several items as SXR's "confidential information" or "trade secrets," including computer processes, computer programs and codes, client contact information, customer lists, customer preferences, financial information, and radiologist contact information. *Id.*  By the plain terms of the Non-Disclosures, Spears and Vaughn agreed they were prohibited from utilizing the designated confidential information or trade secrets of SXR for personal gain, from sharing such information with former SXR employees, or from improperly using

or disclosing SXR's confidential information or trade secrets, even if no benefit were derived from such use or disclosure. *Id.*

On January 25, 2013, Plaintiffs filed in this Court a Complaint (Doc. 1) alleging that all Defendants infringed Plaintiffs' copyright in the PACSRat software; stole Plaintiffs' trade secrets in violation of the Arkansas Trade Secrets Act, Ark. Code Ann. § 4-75-601, *et seq.*; engaged in unfair competition and tortious interference with Plaintiffs' contractual relationships; and violated the Arkansas Deceptive Trade Practices Act, Ark. Code Ann. § 4-88-107. The Complaint further alleges that Spears and Vaughn breached their fiduciary duties and employment contracts with SXR.

On the same date Plaintiffs filed their Complaint, they also filed a Motion for Preliminary Injunction (Doc. 5), asking the Court to enjoin Defendants' use of Plaintiffs' copyrighted software and trade secrets. Defendants denied all wrongdoing. The Court then held a two-day evidentiary hearing on the Motion for Preliminary Injunction on February 26, 2013 and March 1, 2013, receiving evidence and hearing testimony from a number of witnesses. After Plaintiffs concluded their case, the Court announced from the bench that Plaintiffs had failed to establish their entitlement to a preliminary injunction on the basis of Defendants' alleged copyright infringement, principally because Plaintiffs had failed to put on proof that either SXR or Real Radiology would be irreparably harmed, whether through the loss of current customers, prospective customers, or profits, if the injunction did not issue. The Court reserved its ruling on whether Defendants should be enjoined from using Plaintiffs' trade secrets.

## II. Standard of Review

"The primary function of a preliminary injunction is to preserve the status quo until, upon final hearing, a court may grant full, effective relief." *Ferry-Morse Seed Co. v. Food Corn, Inc.*, 729

F.2d 589, 593 (8th Cir. 1984).  "A preliminary injunction is an extraordinary remedy and the burden of establishing the propriety of an injunction is on the movant."  *Roudachevski v. All-Am. Care Centers, Inc.*, 648 F.3d 701, 705 (8th Cir. 2011).  The court determines whether the movant has met its burden of proof by weighing the following factors:  (1) the movant's probability of success on the merits; (2) the threat of irreparable harm to the movant; (3) the balance between the harm suffered by the movant and the harm that other interested parties will incur if an injunction is granted; and (4) whether the issuance of an injunction is in the public interest.  *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981) (en banc).  *See also Minn. Mining and Mfg. Co. v. Rauh Rubber, Inc.*, 130 F.3d 1305, 1307 (8th Cir. 1997); *Sanborn Mfg. Co., Inc. v. Campbell Hausfeld/Scott Fetzer Co.*, 997 F.2d 484, 485-86 (8th Cir. 1993).

Before turning to the four *Dataphase* factors in the case at bar, the Court observes that these factors must be weighed before deciding whether to issue a preliminary injunction, regardless of the subject matter of the underlying lawsuit.  Although Plaintiffs cite to the Eighth Circuit's opinion in *Taylor Corporation v. Four Seasons Greetings, LLC*, for the proposition that "[i]n copyright infringement cases, the general rule is that a showing of a *prima facie* case [of infringement] raises a presumption of irreparable harm," 315 F.3d 1039, 1041-42 (8th Cir. 2003), this "general rule" has not been good law since 2006, when the Supreme Court issued its opinion in the case of *eBay Inc. v. MercExchange, L.L.C.*.  547 U.S. 388, 393 (2006).

Prior to the decision in *eBay*, preliminary injunction actions involving allegations of intellectual property infringement were evaluated differently than other alleged violations of law.  In copyright, patent, and trademark cases, the second *Dataphase* factor, irreparable harm, was presumed once the moving party made a *prima facie* case of infringement.  *See, e.g., Taylor*, 315

F.3d at 1041-42. The effect of this presumption was to dramatically lessen the moving party's burden of proof. *Id.* at 1042. Once a *prima facie* case of infringement were established and irreparable harm consequently presumed, the balance of harms (the third *Dataphase* factor) effectively became "negligible," and the potential effect on the public interest in issuing the injunction (the fourth *Dataphase* factor) would also be presumed. *Id.*

In 2006, the Supreme Court ruled in *eBay* that preliminary injunction actions involving allegations of intellectual property infringement should not be evaluated according to different criteria. 547 U.S. at 393. The Court held that no presumption of irreparable harm was warranted simply because a *prima facie* case of infringement could be made. *Id.* at 393-94 (". . . this Court has consistently rejected invitations to replace traditional equitable considerations with a rule that an injunction automatically follows a determination that a copyright has been infringed.").

Following the decision in *eBay*, federal courts of appeals throughout the country recognized that there was no justification for holding intellectual property disputes to a different standard than all other disputes when evaluating motions for preliminary injunctions. They acknowledged that it was no longer good law to presume irreparable harm upon a showing of likelihood of success on the merits in a patent, trademark, or copyright infringement case. *See, e.g.*, *Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc.*, 645 F.3d 26, 31 (1st Cir. 2011); *Salinger v. Colting*, 608 F.3d 68, 74-75 (2d Cir. 2010); *Christopher Phelps & Assocs., LLC v. Galloway*, 492 F.3d 532, 543 (4th Cir. 2007); *Paulsson Geophysical Servs., Inc. v. Sigmar*, 529 F.3d 303, 312 (5th Cir. 2008); *Flexible Lifeline Sys., Inc. v. Precision Lift, Inc.*, 654 F.3d 989, 995-96 (9th Cir. 2011).

Even though the Eighth Circuit has yet to acknowledge *eBay*'s holding with respect to the preliminary injunction factors, other district courts in this circuit have recognized the change. *See,*

*e.g., Travel Tags, Inc. v. UV Color, Inc.*, 690 F. Supp. 2d 785 (D. Minn. 2010); *CHS, Inc. v. Petronet, LLC*, 2010 WL 4721073 (Nov. 15, 2010 D. Minn.).  Accordingly, the Court will use the same four-factor *Dataphase* analysis in evaluating Plaintiffs' copyright infringement and Arkansas Trade Secrets Act claims, making no presumptions as to irreparable harm.

## III.  Discussion

### A.  Copyright Infringement

The four factors that must be considered in determining whether a  preliminary injunction should be granted are likelihood of success on the merits, irreparable harm, the balance of the harms as between Plaintiffs and Defendants, and the public interest.  *Dataphase*, 640 F.2d at 114. Beginning with Plaintiffs' copyright infringement allegation, the Court heard testimony on the first *Dataphase* factor, likelihood of success on the merits, during the first day of the preliminary injunction hearing held on February 26, 2013.  Witnesses testified and evidence was presented regarding the originality of Plaintiffs' copyrighted software, the development of the software over the course of years, the distinct elements of the software that are considered unique and original as compared to the elements that are readily available in the public domain, and the purported similarities between the copyrighted PACSRat software and the allegedly infringing software used by Rapid Rad.  To prove copyright infringement, Plaintiffs must demonstrate by direct or circumstantial evidence Defendants' access to the copyrighted materials, plus a substantial similarity between the copyrighted materials and the infringing materials. *Taylor*, 315 F.3d at1042.

The Court acknowledges that the parties have not yet engaged in discovery, and Plaintiffs' allegations of copying are, therefore, more difficult to prove at this stage in the litigation.  However, the Court does not rule on the merits at this stage and merely considers likelihood of success.  The

Court concludes that, considering the evidence currently before it, there is insufficient proof of copying by Defendants to establish that Plaintiffs are likely to succeed on the merits of their infringement claim.  The Court acknowledges that in the course of the litigation, Plaintiff may well be successful in amassing greater evidence of copying; however, at this point, the evidence of copying is essentially limited to comparisons between three screenshots of SXR's website and Rapid Rad's website.  *Compare* Preliminary Injunction Hearing, Plaintiffs' Exhibit 2, Tabs 4 and 5.

Plaintiffs' technology expert Dave Fuller, who testified at the hearing, was unable to access Rapid Rad's entire computer software package prior to the hearing to compare it to Plaintiffs' PACSRat software; instead, Mr. Fuller compared three screenshots from Rapid Rad's publicly accessible website to three similar-looking screenshots from SXR's website.  The Court then heard testimony from Defendants' expert, John Lockwood, which convinced the Court that the basic elements and the "look and feel" of these two sets of screenshots were generated using publicly available source codes, resulting in login forms and user interface pages that are not unique to SXR.

Even if the Court were to assume the uniqueness of the PACSRat software, and further, that actual copying had occurred such that Plaintiffs would likely succeed on the merits of their infringement claim, the fact remains that Plaintiffs have failed to establish irreparable harm, which is the second *Dataphase* factor.  "To succeed in demonstrating a threat of irreparable harm, 'a party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief.'" *Roudachevski*, 648 F.3d at 706 (quoting *Iowa Utils. Bd. v. Fed. Commc'ns Comm'n*, 109 F.3d 418, 425 (8th Cir. 1996)).  Plaintiffs put on no proof at the hearing that they were likely to suffer, now or in the future, any irreparable harm as a result of the alleged copying.  "Failure to show irreparable harm is an independently sufficient ground upon which to

-8-

deny a preliminary injunction." *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003).

As for the third *Dataphase* factor, the balancing of the harms, it is evident that in the absence of proof of irreparable harm to Plaintiffs, any showing of harm to Defendants, however minimal, will weigh in Defendants' favor.  In evaluating the pleadings, the Court finds that Defendants have sufficiently asserted that they will suffer some degree of economic harm if a preliminary injunction were granted and the Court enjoined Rapid Rad from using its computer software and website. Because Rapid Rad's teleradiology business is conducted online, through the integration of various electronic media, an injunction prohibiting Rapid Rad from using its computer software would damage, if not completely shut down, Rapid Rad's business.  The Court must consider the potential economic harm that each party may suffer if a preliminary injunction is granted.  *Baker Elec. Co-op, Inc. v. Chaske*, 28 F.3d 1466, 1473 (8th Cir. 1994).  Accordingly, the third *Dataphase* factor weighs in favor of Defendants on the copyright infringement claim.

Finally, the fourth factor in the *Dataphase* test also weighs in favor of Defendants.  The public does not benefit when a competitor in the marketplace, such as Rapid Rad, is effectively foreclosed from competition due to the mere possibility of copyright infringement, absent a showing of actual or potential injury to the copyright holder.  Although "[t]he public interest is served in protecting the holders of valid copyrights from infringing activity," *Taylor*, 315 F.3d at 1042, there is insufficient evidence before the Court at this point to surmise that infringement has likely occurred.

Because all four *Dataphase* factors weigh against the issuance of a preliminary injunction on the basis of copyright infringement, no preliminary injunction will issue on this basis.

### B. Arkansas Trade Secrets Act Claim

Under the Arkansas Trade Secrets Act, a trade secret is defined as "information, including a formula, pattern, compilation, program, device, method, technique, or process" that

> (A)  Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and
> (B) Is the subject of efforts that are reasonable under the circumstances to maintain their secrecy.

Ark. Code Ann. § 4-75-601(4)(A-B).

SXR contends its trade secrets include its customer lists, customer contacts, customer orders, and customer preferences; company financial information, including pricing and "bill rates;" computer processes, programs, and codes; contract physician contact information; employee lists; marketing strategies; and information concerning company business methods.  (Doc. 21, p. 9). According to the Non-Disclosures signed by both Spears and Vaughn during the course of their employment with SXR, all of the above-listed items are purported to be "confidential business information and trade secrets."  (Doc. 1-5).

Turning to the *Dataphase* factors, in order for the Court to evaluate Plaintiffs' likelihood of success on the merits with respect to their Arkansas Trade Secrets Act claims, the Court must consider whether each trade secret asserted by Plaintiffs qualifies for protection under the Act. Initially, it appears that the items claimed by Plaintiffs meet the statutory definition of a trade secret. *See* Ark. Code Ann. § 4-75-601(4)(A-B).  However, this does not end the inquiry.  In order to enjoy the protections of the Act, the owner of a trade secret must take reasonable measures to guard the information's secrecy; otherwise, the information loses its protected status.  *ConAgra, Inc. v. Tyson Foods, Inc.*, 342 Ark. 672, 678-81 (2000).

-10-

The Arkansas Supreme Court has set forth six factors that reviewing courts must analyze, in addition to the definitions contained within the statute, in order to determine if information is entitled to trade secret protection.  The factors are:  (1) the extent to which the information is known outside the business; (2) the extent to which the information is known by employees and others involved in the business; (3) the extent of measures taken by the plaintiff to guard the secrecy of the information; (4) the value of the information to the plaintiff and its competitors; (5) the amount of effort or money expended by the plaintiff in developing the information; and (6) the ease or difficulty with which the information could properly be acquired by others.  *Saforo & Assocs., Inc. v. Porocel Corp.*, 337 Ark. 553 (1999) (citing *Vigoro Indus., Inc. v. Cleveland Chem. Co. of Ark.*, 866 F. Supp. 1150 (E.D. Ark. 1994), *aff'd in part*, *rev'd in part*, 82 F.3d 785 (8th Cir. 1996)).

During the preliminary injunction hearing, the Court heard testimony and received evidence regarding SXR's maintenance of its customer lists, customer contacts, customer orders, and customer preferences; company financial information, including pricing and "bill rates;" computer processes, programs, and codes; and contract physician contact information.  No evidence was presented regarding SXR's efforts to keep its employee lists, marketing strategies, or general information concerning company business methods confidential.  Therefore, the Court will confine its analysis of SXR's claimed trade secrets to (1) customer information (including contacts, orders, and preferences), (2) financial information (including pricing and "bill rates"), (3) computer information (including processes, programs, and codes), and (4) contract physician information.

### 1.  Customer Information

The Court heard sufficient testimony from witnesses to conclude that although SXR's customer contacts could be found, in many cases, through public media sources, SXR's particular

customer information, including customer preferences, was not generally known outside SXR, was kept secret by SXR via reasonable measures, and was valuable to SXR and its competitors. In addition, the testimony of Paul Kuna, president and founder of SXR, and Defendant Spears established that Spears had, at times, exclusive access to SXR's customer information through his position as SXR's Marketing Director. The Court surmises from the testimony presented that Spears potentially misappropriated or mishandled SXR's customer data for his use or for Rapid Rad's use. Consequently, the Court must conclude that Plaintiffs are likely to succeed on the merits in proving that SXR's customer information is a trade secret and that one or more Defendants violated Arkansas law with respect to the use of this trade secret.

Despite the Court's finding as to Plaintiffs' likelihood of success, the Court does not find that Plaintiffs presented any credible evidence of irreparable harm resulting from Defendants' alleged misappropriation of customer information. Mr. Kuna of SXR testified at the hearing that all customer contacts, preferences, and order information that were proprietary to the business were transferred to Real Radiology as of the close of 2012. Consequently, Mr. Kuna was unable to articulate any harm that his company would suffer as a result of any Arkansas Trade Secrets Act violation, since SXR no longer performs teleradiology services.

Kim Kuna, treasurer and co-owner of SXR, also testified at the hearing that Defendants' trade secrets violations could possibly result in a loss of current or potential clients to SXR or Real Radiology; however, Mrs. Kuna was unable to identify any current or potential clients that had been lost, nor was she able to articulate any reputational or economic loss suffered by SXR or Real Radiology as a result of Defendants' alleged trade secrets violations. Spears testified that Rapid Rad currently has eight clients. Of these eight clients, three are current clients of SXR, though they do

-12-

not purchase teleradiology services from SXR.  All three of these clients began purchasing teleradiology services from Rapid Rad after SXR sold its teleradiology business to Real Radiology. Consequently, it appears that (1) no clients of SXR were lost to Rapid Rad, and (2) Real Radiology made no showing that Rapid Rad "stole" any of its clients.  The only representative of Real Radiology who was present at the hearing was an employee named Wes Dean, who did not offer any testimony as to irreparable harm.

Since neither SXR nor Real Radiology has met their burden of proof of showing irreparable harm as a result of Defendants' alleged misappropriation of customer information, no injunction may issue.  As stated above, "[f]ailure to show irreparable harm is an independently sufficient ground upon which to deny a preliminary injunction." *Watkins*, 346 F.3d at 844.  Accordingly, the Court has no need to discuss the remaining two *Dataphase* factors.

### 2.  Financial Information

From the testimony presented at the hearing, the Court concludes that Plaintiffs did not take reasonable measures to guard the secrecy of their billing rates and practices, and from the examples presented to the Court at the hearing, it appears that many of SXR's billing rates and practices are standard in the teleradiology industry.  Furthermore, SXR's customers, potential customers, and radiologists are or were under no contractual or other obligation to keep the billing rates and practices of SXR confidential.  Radiologists are also not asked to sign confidentiality agreements and may divulge their billing rates at will.  For all of these reasons, the Court finds that Plaintiffs are not likely to succeed on the merits in proving that SXR's financial information is a trade secret.

In addition, neither SXR nor Real Radiology have met their burden of proof in showing irreparable harm as a result of Defendants' alleged misappropriation of financial information.  No

evidence was presented to the Court by Plaintiffs on this issue.  Consequently, the preliminary injunction may be denied on this basis alone without further discussion of the remaining *Dataphase* factors.

### 3.  Computer Information

Conflicting testimony was presented at the hearing regarding whether SXR's computer software, processes, programs, and code were maintained in secrecy by SXR.  The Court heard evidence that certain SXR clients were provided  password-access to areas of SXR's website that were ordinarily restricted to employees.  In addition, Defendants' expert witness, Mr. Lockwood, showed the Court in a live demonstration how he could access SXR's allegedly "secret" database by logging into an area of SXR's website without inputting a password.  Mr. Lockwood also testified that, again without a password, he was able to obtain a back-up copy of SXR's billing database, complete with client names and records of receivables.

In light of the six *Saforo* factors that the Court must consider in determining whether an alleged trade secret is entitled to protection, it appears that Plaintiffs' computer information does not, on balance, qualify as a trade secret.  337 Ark. at 559-62.  Mr. Kuna did testify that SXR spent around $2 million over the course of seven years developing SXR's unique teleradiology software, and the Court recognizes that the amount of effort or money that a plaintiff expends in developing a product or process weighs in favor of trade secret protection.  *Id.*  However, it is also true that Plaintiffs failed to make a sufficient showing that SXR's computer information was:  (1) not known outside the business; (2) not known to employees involved in the business; (3) guarded by Plaintiffs and kept secret; (4) valuable to Plaintiffs and their competitors; or (5) only accessed by members of the public with difficulty.  *See id.*  Taking these factors into account, it appears that Plaintiffs'

computer information does not qualify as a trade secret under state law, according to the evidence presented thus far.

Even if this information did qualify as a trade secret, the fact remains that there was little to no evidence presented to the Court that Defendants misappropriated or copied for their own use any of Plaintiffs' computer-related information.  As discussed above with regard to copyright infringement, the Court is not convinced that any illegal copying actually occurred, and Plaintiffs failed to meet their burden of proof in this regard.  In addition, the hearing testimony of Plaintiffs' and Defendants' computer experts tended to show that the portions of Rapid Rad's computer information that were allegedly misappropriated as trade secrets—three relatively generic screenshots showing login and user interface functions—were likely not unique to SXR and could be generated by downloading publicly available source code, without resorting to copying Plaintiffs' software.

The Court concludes, after a careful analysis of the testimony and evidence presented on the question of whether SXR's computer information is entitled to trade secret protection, that Plaintiffs have not established a likelihood of success on the merits as to this claim at this time.  As for the other three *Dataphase* factors, the Court explained in detail in the copyright infringement discussion above that Plaintiffs failed to meet their burden of proof of irreparable harm arising from Defendants' alleged copying of Plaintiffs' computer information.  Because Plaintiffs failed to a likelihood of success and irreparable harm, there is no need for the Court to discuss the remaining two *Dataphase* factors, as there is sufficient evidence to show that a preliminary injunction must be denied.

-15-

### 4. Contract Physician Information

The last trade secret claim for the Court to consider is the nature of Plaintiffs' contract physician information.  Plaintiffs maintain that information related to their radiologists under contract, including, the Court presumes, the radiologists' identities, accreditation and licenses, and work preferences, are all trade secrets.  Compared to the testimony presented on customer or client information, there was comparatively little evidence presented by the parties regarding radiologist information.  Mr. Kuna testified that SXR's contracting radiologists' contact information could not be easily obtained by performing simple internet searches using publicly available sources.  However, Mr. Kuna also admitted that radiologists did not sign exclusive contracts with SXR or Real Radiology, and radiologists were essentially free agents with the ability to contract with any teleradiology business they wished.  Mrs. Kuna further testified that Plaintiffs' clients could potentially obtain information on any radiologist under contract with SXR or Real Radiology, without any duty to keep such information secret from Plaintiffs' competitors or from other clients.

SXR alleges that Spears was actively soliciting SXR's radiologists to work for Rapid Rad.  However, Spears testified that he sent an e-mail "blast" solicitation to over 600 radiologists, of whom only around 40 were under contract with SXR. (Preliminary Injunction Hearing, Defense Exhibit 8).  Both Spears and Mrs. Kuna testified that in December 2012 or January of 2013, Real Radiology fired around 20 out of 42 radiologists under contract with SXR.  As a result of Real Radiology's decision to downsize its radiology staff by half, Spears contends that radiologists who were formerly working for SXR but had been fired by Real Radiology either affirmatively contacted Rapid Rad or responded to Spears' email blast because they were looking for teleradiology work.

Now that the relevant facts surrounding the trade secrets claim relative to radiologist

-16-

information has been set forth, the Court turns to the six *Saforo* factors to determine whether this information qualifies as a trade secret. Initially, the Court finds that Plaintiffs did not take reasonable measures to guard the secrecy of their radiologists' information. There was testimony sufficient to show that such information was generally known within the teleradiology industry, could be acquired with relative ease by interested parties, and Plaintiffs took few, if any, active measures to safeguard this information. Overall, it appears that Plaintiffs' allegedly "secret" radiologist information was not particularly valuable to Plaintiffs or to their competitors.

Despite Plaintiffs' apparent failure to keep its radiologist information secret, it is evident that Spears was certainly privy to all radiologist data, including preferences, and Spears took all radiologist contact information with him when he left SXR. It follows that there is some evidence that Spears potentially misappropriated this information while still working for SXR. There is also some evidence that SXR expended effort and money in developing, through Spears, contact information for its radiologists. On balance, therefore, it appears that Plaintiffs have some likelihood of success on the merits of their trade secrets claim with respect to radiologist information.

Nevertheless, in spite of Plaintiffs' likelihood of success on this claim, they have not presented any credible evidence of irreparable harm resulting from Defendants' misappropriation of radiologist information. No negative business consequences appear to flow from Defendants' misappropriation of radiologist information, if such misappropriation occurred. Accordingly, since Plaintiffs' lack of irreparable harm is an independent basis on which to deny the issuance of a preliminary injunction, the Court will not discuss the remaining *Dataphase* factors.

## IV. Conclusion

Plaintiffs Southeast X-Ray, Inc. and Real Radiology, LLC's Motion for Preliminary Injunction (Doc. 5) is DENIED.  As for Plaintiffs' renewed Motion for Leave to Serve Written Discovery on an expedited basis, the Court finds that there is no justification for expedited discovery in this case, particularly in light of Plaintiffs' failure to make a showing of irreparable harm. Accordingly, Plaintiffs' Motion for Leave is DENIED, and discovery in this case will proceed according to the schedule referenced in the Court's Initial Scheduling Order.  (Doc. 20).

IT IS SO ORDERED this 8th day of March, 2013.

/s/ P. K. Holmes, III
P.K. HOLMES, III
CHIEF U.S. DISTRICT JUDGE